UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 24-20070-DDC** |
| **NEWTON JONES (01),**<br>**WILLIAM CREEDEN (02),**<br>**KATERYNA JONES (03),**<br>**WARREN FAIRLEY (04),**<br>**LAWRENCE McMANAMON (05),**<br>**KATHY STAPP (06),**<br>**CULLEN JONES (07),** | |
| **Defendants.** | |

## DEFENDANTS' AMENDED MOTION FOR ISSUANCE OF RULE 17(c) SUBPOENA DUCES TECUM TO THE IBB

Defendants Newton Jones, William Creeden, Kateryna Jones, Warren Fairley, Lawrence McManamon, and Cullen Jones ("Defendants"), by and through their undersigned counsel and pursuant to Federal Rule of Criminal Procedure 17(c), hereby respectfully move this Court to authorize the issuance of the attached subpoena duces tecum ("Subpoena") to the International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers, and Helpers ("IBB"). The proposed Subpoena is attached as Exhibit 1, with the date and time of return for the Subpoena left blank to be filled in by the Court once this motion is decided.

### Background

The Court is already familiar with the background of this case, so Defendants will not recite it here. Instead, they refer the Court to the background section of their prior Rule 17(c) motion to the IBB. (Doc. 173.) The Court denied that motion largely for lack of specificity, while also noting

that Defendants could "target crucial portions of the requested email accounts—with search terms or specified dates" to satisfy the specificity requirement under *Nixon*. (Doc. 202 at 9). The undersigned contacted counsel for IBB, who has declined to provide the materials[1] absent a subpoena. As such, and for the reasons set out below, Defendants now respectfully move for an order issuing the requested Subpoena.

### Legal Standard[2]

The Tenth Circuit summarized the legal principles governing a request for a Rule 17(c) subpoena in *United States v. Abdush-Shakur*, 465 F.3d 458 (10th Cir. 2006). As the Circuit explained,

> Rule 17(c) [of the Federal Rules of Criminal Procedure] provides that "a subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein." Rule 17(c) is "not intended to provide an additional means of discovery," but "to expedite the trial by providing a time and place before trial for the inspection of the subpoenaed materials." *Bowman Dairy Co. v. United States*, 341 U.S. 214, 220 (1951). A party seeking a subpoena duces tecum under Rule 17(c) must establish:
>
> > (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."
>
> *United States v. Nixon*, 418 U.S. 683, 699–700 (1974). Thus, "on appeal from the denial of a Rule 17(c) motion, the movant must show that the subpoenaed document was relevant, admissible, and specific." *United States v. Gonzalez–Acosta*, 989 F.2d 384, 389 (10th Cir. 1993). Failure of one of these elements precludes reversal. *See United States v. Morris*, 287 F.3d 985, 991 (10th Cir. 2002) (affirming district court's suppression of a subpoena under Rule 17(c) where defendant arguably established relevance and admissibility, but not specificity).

---

[1] Defendants requested all of the documents specified below (with the exception of communications relating to healthcare reviews), and the IBB to date has not agreed to produce any.

[2] This Court pronounced the governing standard in its prior order. (Doc. 202 at 3.) Defendants quote from that here without alteration or further attribution.

*Abdush-Shakur*, 465 F.3d at 467 (quotation cleaned up).

**Argument**

Each item sought in the proposed Subpoena satisfies *Nixon* by describing a specific set of documents, identified by specific dates and issues, that are relevant to the case and admissible in evidence. The Subpoena seeks documents related to core issues in the case and that are essential to the defense, including (but not limited to) documents and communication between IBB officers and the IBB's general counsel, Blake & Uhlig, regarding the charged conduct, as well as communications between Kathy Stapp and the IBB's outside accountant, Legacy Professionals, LLP ("Legacy"), regarding repeated independent audits approving that same conduct. Although there are several requests, due to the highly specific nature of each, taken together they seek far fewer documents than the previous proposed subpoena. These documents are specifically described, highly relevant to the defense, and will be admissible at trial for the reasons discussed in turn below.

**I.    Kathy Stapp Communications, Notes, and Memoranda**

Kathy Stapp is a defendant in this case. She has now pled guilty and is expected to testify at trial. She was previously the special assistant to the International Secretary Treasurer ("IST") and later the International Secretary Treasurer. Ms. Stapp has admitted on multiple occasions that she herself specifically authorized much of the charged conduct. *See, e.g*., Doc. 79 at Section 2(h) (providing examples of Ms. Stapp admissions, including "authorizing and executing expenditures from the IBB treasury" such as "domestic meetings …[with] lavish accommodations, food and drink," "approving expenses for dozens of international trips," "approving and executing employment…for Kateryna Jones, and other members of the Jones family," "approving and

executing relocation expenses for Cullen Jones," and "placing ineligible persons on the [IBB's] Health Care plan," among other things).

During much of the relevant time, Ms. Stapp was also married to the IBB's outside General Counsel, Michael Stapp (now deceased) of the law firm Blake & Uhlig. In both her role as special assistant to the IST and/or the IST herself and given the practical realities of her relationship with the IBB's general counsel, Ms. Stapp regularly served as a go-between for the IBB and Blake & Uhlig when legal questions or issues arose. *See, e.g.*, Exhibit 2, Kathy Stapp Email.[3]

Ms. Stapp's central role in the procurement of legal advice from Blake & Uhlig is most clearly evidenced by the fact that the September 20, 2022 memorandum ("Blake & Uhlig Memo") regarding "Union Payments to Officers and Employees" is addressed **to Ms. Stapp directly**, as well as Timmothy Simmons ("Simmons").[4] The Blake & Uhlig Memo–which was written by Ms. Stapp's husband, Michael Stapp, provided as follows:

> I believe this memorandum should aid you as you decide on recommendations to President Jones regarding the various expense reporting and reimbursement issues discussed on September 13, 2022. ***Please consult with me and/or AGC [Jason] McClitis regarding specific recommendations before you submit those to President Jones.***
>
> This memorandum addresses the subject of the salary, benefits, and other expenses that a union is permitted to pay its officers and employees under the LMRDA and other applicable laws. . . .
>
> If the IEC were to adopt rules which provide a detailed explanation of what and how reasonable expenses will be reimbursed, the courts will likely defer to IBB. Those rules must also conform to DOL and IRS record keeping requirements.
>
> Without such rules the officers and staff are left to struggle with the broader language of the Constitution and their belief as to what "past practice" has been. ***This can result in honest mistakes*** and conflicting interpretations. The courts are

---

[3] Defendants are not seeking documents related to this specific advice about LMRDA compliance but provide this email as one example of Ms. Stapp's role as it pertains to Blake & Uhlig.

[4] Simmons is now the IBB President but, at the time, was one of the IBB's International Vice Presidents ("IVPs"). Simmons' relevancy is more fully addressed below.

much less likely to defer to IBB, if it can be shown that there are conflicting practices among the IBB officers and staff concerning expense reimbursements.

*See* Exhibit 3, Blake & Uhlig Memo at 1-2 (emphasis added). The memo then went on to discuss various other topics at issue in the Indictment, including the "reasonableness" of expenses, and that the IBB Constitution "Provides Fairly Broad Authorization Regarding Salaries And Expenses." *Id.* at 6-7.

The Blake & Uhlig Memo was the subject of (and basis for) the Court's prior Memorandum and Order finding the IBB waived its attorney-client privilege for certain subject matters.[5] The Blake & Uhlig Memo followed a meeting on or about September 13, 2022, among Kathy Stapp, Michael Stapp (general counsel), and Simmons.

Months later, in February of 2023, the IBB held its annual IEC meeting in Marco Island, Florida. At this meeting, IVPs Simmons, Tom Baca ("Baca"), and John Fultz ("Fultz") accused President Jones of improper expenditures. As it relates to Ms. Stapp, following the Marco Island meeting, Simmons approached Ms. Stapp regarding the accusations and, in response, Ms. Stapp provided Simmons with "a lot of documentation"[6] that Simmons then used as the basis for the Whistleblower Letter (defined and discussed more fully below).

The months following the Whistleblower Letter included, relevant to Ms. Stapp, additional communications with Blake & Uhlig regarding the September 2022 Memo, the Marco Island meeting, and the Whistleblower and Article 17 charge, as well as discussions with David Elbaor ("Elbaor"), another attorney for the IBB who was assisting the IBB with the Department of Justice investigation and related matters.

---

[5] *See* Doc. 177 at 12 (finding waiver for the "expense reporting and reimbursement issues discussed on September 13, 2022[,]" the salary, benefits, and other expenses that a union is permitted to pay its officers and employees" under the law, and any "Expense Policy" that the IEC may have adopted–as referenced in the Blake & Uhlig Memo).

[6] As testified to by Simmons during grand jury proceedings.

Despite Ms. Stapp's central role at the IBB, including her role relating to the exact conduct charged here and as a go-between for advice-of-counsel, and despite surrendering all other defendants' emails, the IBB's current leaders (which include Simmons, Baca, and Fultz) have refused to release Kathy Stapp's entire email account. This Court denied Defendants' previous request for issuance of a Rule 17(c) subpoena, which sought Stapp's whole email account, reasoning that "defendants' email requests include no search terms, no specific dates, and no other limiting methods, thus falling far short of identifying 'sharply defined groups of documents.'" (Doc. 202 (quoting *United States v. Jackson*, 155 F.R.D. 664, 668 (D. Kan. 1994)).) Consistent with the Court's direction, and with the above context in mind, Defendants now seek the specific documents described below.

### A.    Kathy Stapp's Communications with Counsel

The proposed Subpoena specifies the following communications between Kathy Stapp and the IBB's counsel and her related notes and memoranda:

- Emails and notes from May 1, 2022 through September 20, 2022 reflecting conversations between Kathy Stapp and any representative of Blake and Uhlig regarding the Fall 2022 meeting between Kathy Stapp, Tim Simmons, and Blake and Uhlig attorneys.

- Emails from May 1, 2022 through September 20, 2022 between Kathy Stapp and representatives of Blake and Uhlig regarding the September 20, 2022 memorandum addressed to Kathy Stapp.

- Emails from February 1, 2023 through June 3, 2023 between Kathy Stapp and any representative of Blake and Uhlig regarding the whistleblower letter and Article 17 charge.

- Emails from March 1, 2015 through August 24, 2015 between Kathy Stapp and any representative of Blake and Uhlig regarding the IBB's payment of backpay to Kate Jones in April 16, 2015 and August 24, 2015.

- Emails from July 1, 2023 through August 1, 2023 between Kathy Stapp and any representative of Blake and Uhlig regarding the vacation payouts to Defendants in July 2023.

- Emails from April 17, 2022 through December 12, 2023 between Kathy Stapp and David Elbaor regarding Mr. Elbaor's investigation into the IBB's policies and procedures, including for reimbursements and expenses.

- Emails from August 1, 2022 through June 3, 2023 (date of Newt Jones "expulsion," see Indictment at p. 3) between Kathy Stapp and any representative of Blake and Uhlig regarding "the expense reporting and reimbursement issues discussed on September 13, 2022."

- Emails from May 1, 2022 through June 3, 2023 (date of Newt Jones expulsion, see Indictment at p. 3) between Kathy Stapp and any representative of Blake and Uhlig regarding the "salary, benefits, and other expenses that a union is permitted to pay its officers and employees' under the law."

These documents are relevant, admissible, and described with specificity. To meet the requisite burden, each of the requests identifies documents by specific date and are "sharply defined." *See United States v. Jackson*, 155 F.R.D. at 668. The requests are limited to specific timeframes and topics about which Defendants know from other materials provided in discovery Ms. Stapp was communicating with counsel and limited the requested to targeted dates surrounding those conversations. In doing so, Defendants have satisfied the specificity requirements by detailing "the item sought and what the item contains." *See* Doc. 202 at 4-5 (citing *United States v. Romero*, No. 21-cr-00559-JCH, 2023 WL 2614472, at *3 (D.N.M. Mar. 23, 2023)).

As for relevance, each of these requests involve topics that are not only referenced in, but are essential to, the conduct alleged charged in the Indictment. The Government alleges a broad racketeering conspiracy arising from Defendants' employment at the IBB, including that Defendants engaged in a conspiracy to convert IBB funds to their own benefit by engaging in

unnecessary and unauthorized expenditures, and to pay people the Government alleges performed little or no work for the IBB. Each was the subject of counsel received by Defendants, which regularly flowed through Ms. Stapp. Ms. Stapp's communications on these very topics are therefore relevant to–and necessary for–the defense. *See Nixon*, 418 U.S. at 700 (requiring "rational inference" of relevancy*); see also United States v. Wenger*, 427 F.3d 840, 853 (10th Cir. 2005) (explaining"[g]ood faith reliance on counsel...is [] one factor a jury may consider" when determining mens rea).

Finally, Ms. Stapp's communications with Blake & Uhlig are admissible. This Court previously ruled that the IBB's prior disclosure of the Blake and Uhlig Memo waived privilege on communications related to the subject-matters of "expense reporting and reimbursement issues discussed on September 13, 2022[,]" and the "salary, benefits, and other expenses that a union is permitted to pay its officers and employees." (Doc. 177 at 12). Communications with Blake & Uhlig relating to those very topics are largely what Defendants seek here, rendering any claim of privilege over the same waived. And for the same reasons this Court found a waiver of privileged matters discussed in the September 20, 2022 memo, it should also find a waiver as to communications about back pay to Defendant Kateryna Jones, which was the subject of a 2013 memo from Blake and Uhlig that the IBB voluntarily produced to the Government.  *See* Exhibit 4, Memorandum Discussing Backpay to Kate Jones. The documents are therefore not privileged and are admissible.

As for communications with Elbaor, the IBB's privilege over those communications are similarly waived because Elbaor disclosed the content of those communications to third parties on multiple occasions. For example, on January 13, 2023, AUSA Faiza Alhambra summarized an email a conversation she had with Elbaor, in which Elbaor told Ms. Alhambra that "he found

significant documentation *of the work-related purposes of Newton Jones' international trips*,"

including that the "purpose of Ukraine, Warsaw and Italy trips are *well documented* ." *See* Exhibit

5, Government Email (emphasis added). By disclosing this information to the Government–

specifically, information regarding the legitimacy of the IBB's expenses–privilege was waived

over all communications relating to this subject. *See* Doc. 177 at 7 (citing *Burke v. Regalado*, 935

F.3d 960, 1023 (10th Cir. 2019) ("voluntary disclosure by the client to a third party waives the

privilege not only as to the specific communication disclosed, but often as to all other

communications relating to the same subject matter.").

Moreover, as Defendants detailed in prior briefing, Elbaor filed a collection lawsuit against

the IBB in the Circuit Court for the City of Charlottesville, Case No. 540CL23000534-00, and in

response, the IBB filed a counterclaim alleging that during his representation, Elbaor discovered

"malfeasance" by IBB officers.[7] *See* Exhibit 6, IBB's Counterclaim. The IBB's Counterclaim

includes allegations that Defendants were "using IBB resources in violation of the IBB

constitution," "using IBB resources for purposes which served no benefit or purpose for the

membership," and "using IBB resources to pay for personal travel or other personal expenses…in

violation of IBB policies." *See* Counterclaim at 8, ¶ 14. The IBB also disclosed that Elbaor

purportedly discovered Defendants "fail[ed] to get authorization for the expenditures as required

by the IBB Constitution." *Id*. ¶ 15. The IBB's Counterclaim also states that "[n]otwithstanding the

fact that Mr. Elbaor became aware of the malfeasance of Mr. Jones and others, he continued to

represent the IBB without taking any action to report the misconduct which he discovered." *Id*. ¶

17.

---

[7] To be clear, Defendants disagree with the IBB's statement of facts in the counterclaim, but
reference those statements of facts where relevant to waiver.

The IBB's intentional decision to again disclose otherwise privileged communications with counsel–just like they did with the Blake & Uhlig Memo that led to that waiver–results in another waiver over all communications relating to the same subjects. These subjects are the very subjects Defendants seek here, namely communications involving Mr. Elbaor's investigation into the IBB's policies and procedures, including for reimbursements and expenses. Given the IBB's waiver, the requested Elbaor communications related to those subjects fall within scope of the privilege waiver and are admissible. *See Nixon*, 418 U.S. at 700 (requiring "sufficient preliminary showing" of admissibility).

These communications and related notes are specifically described, relevant, admissible, necessary for Defendants to put on a full defense, unavailable by any other means more reasonable than a subpoena to the IBB itself, likely to delay the trial or result in a mistrial if produced in the middle of it, and tailored in good faith to the issues in the Indictment.

### B. Kathy Stapp's Communications with Legacy

Legacy is the certified public accounting firm ("CPA") that performed yearly audits of the IBB. Legacy also prepared the IBB's financial statements, tax returns, and DOL annual reports. *See* Exhibit 7, Sample Legacy Engagement Letters. At all times, Legacy was required to report "any fraudulent financial reporting or misappropriation of assets." *Id.* at 2. It never did, even though it repeatedly ran tests of the IBB's "accounting records and other procedures," including virtually every category of allegedly wrongful expenditure charged in the Indictment: (1) Defendants' credit card expenditures, (2) their expense reimbursements, (3) their salaries, (4) their vacation accruals, (5) the IBB's journal entries, (6) the IBB's investment and financial reporting systems, (7) Defendants' relocation expenses, (8) healthcare reviews, and (9) the IBB's fraud risk. Kathy Stapp was intimately involved in these tests, all of which produced highly probative and exculpatory results.

Accordingly, the proposed Subpoena demands the following:

- Emails between Kathy Stapp and any representative of Legacy Professionals, LLP ("Legacy"), and any of Kathy Stapp's notes, regarding the topics listed below for the following time periods, which reflect the time period between each Legacy engagement letter and the last Legacy letter for each year: July 12, 2017, through November 22, 2017; June 20, 2018, through November 2, 2018; July 10, 2019, through November 26, 2019; August 10, 2020, through December 4, 2020; July 12, 2021, through November 16, 2021; July 1, 2022, through December 13, 2022; and May 24, 2023, through June 3, 2023:

  - credit card testing,

  - direct expense testing,

  - salary testing,

  - vacation accruals,

  - journal entry testing,

  - investment income schedules,

  - relocation expense testing,

  - healthcare reviews

  - fraud risk inquiries, and

  - the IBB's financial reporting system.

Applying *Nixon*, each of these demands is specific, relevant, admissible, and necessary for trial. They are "sharply defined" and cabined to the duration of the audits for the years 2017-2023.[8] *United States v. Jackson*, 155 F.R.D. at 668. The "items sought" are emails and notes, and

---

[8] The relevant period for Count 1 of the Indictment remains 2009-2023 even though neither the DOL nor the Grand Jury subpoenaed any pre-2017 Legacy workpapers. In order to satisfy the Court's prior Rule 17(c) order, Defendants will need to affirmatively obtain the Legacy workpapers predating 2017 before they can adequately specify the surrounding communications and seek another Rule 17(c) subpoena from the IBB for those.

what they "contain" is information about the relevant topics above, which Ms. Stapp was involved in.  (Doc. 202 at 4-5).

These requests are highly relevant to the defense and admissible both for impeachment purposes and as direct evidence of the Defendants' state of mind.  The Indictment alleges that the Defendants' expenditures on overseas travel, meals, relocation expenses, salaries, vacation payouts, and loans to the Bank of Labor (an entity controlled by the IBB) were "unauthorized," made to enrich themselves, and "not necessary to achieve the union's interests or for its benefit." (Doc. 1 at p. 18 ¶ 22, p. 19 ¶ 25, p. 20 ¶¶ 27-28, p. 21p. 22-23 ¶¶ 33-35, p. 23-25 ¶¶ 37, 40, p. 34 ¶ 2, p. 35 ¶ 2, p. 36 ¶ 2, p. 40 ¶ 2, p. 44 ¶ 2.)  The Government must prove that Defendants had "fraudulent intent" in making these expenditures.  *United States v. Hart*, 417 F. Supp. 1314, 1317 (S.D. Iowa 1976).  If there is any reasonable doubt that Defendants "in good faith believed" the expenditures were made "for union business," they must be acquitted.  *United States v. Ottley*, 509 F.2d 667, 671 (2d Cir. 1975).

**Credit card and direct expense testing:** Legacy tested whether the ***business purpose*** of Defendants' credit card expenditures and direct expense reimbursements "***appear[ed] reasonable***," and it repeatedly concluded they did.  *See* Exhibit 8, Credit Card Testing Reports, at 2, 11, 16; Exhibit 9, Direct Expense Testing Reports.  Legacy's auditors "would contact Kathy Stapp," who "maintain[ed] itineraries for the officers" and "[could] identify what the purpose was . . . ." Exhibit 9 at 2. On their face, her communications with Legacy and related notes on this topic are relevant and admissible.

**Salary charges:** Legacy specifically found they were in line with IEC Board approvals and noted "[a]ll . . . were explained and accounted for from review of personnel files with Kathy Stapp.  ***Appears reasonable.***" Exhibit 10, Salary Testing Reports, at 3-4 (emphasis added).

**Vacation accruals:** Legacy noted that the two-week payout limit did not apply to IVPs; that the 26-week maximum had been lifted in 2013; and that Defendant Newton Jones's payout for more than two weeks in 2019 "***appear[ed] reasonable.***" (emphasis added). Exhibit 11, Vacation Accrual Report Excerpts, at 3, 8. In 2023, Kathy Stapp ***herself*** authorized Defendants' vacation accrual payouts. Doc. 79 at Section 2(i).

**Journal entries:** There was a $300,000 materiality limit for discretionary auditor review of journal entries. At least two relevant sets of entries exceeded that threshold and would have generated scrutiny by Legacy: (1) the allegedly unauthorized $7 million loan (Doc. 1 at p. 24 ¶ 40), which was actually a series of loans that spanned several years beginning in 2016 and reached into 2023, and (2) Defendant Creeden's vacation payout (Doc. 1 at p. 23 ¶ 37), which was specifically approved by Kathy Stapp. *See* Exhibit 12, Journal Entry Testing Reports.

**Investment income schedules:** Communications surrounding these schedules are relevant because Legacy performed an independent assessment of the interest the IBB was earning on the loans to the BOL and concluded it was reasonable. *See* Exhibit 13, Investment Income Schedule Excerpt at 3. As discussed below, Kathy Stapp was deeply involved with the financial reporting process.

**Relocation:** Legacy reviewed and found no issues with the relocation expenses paid to Defendant Newt Jones's daughter and son-in-law in 2019, both of whom received less than other, unrelated employees reviewed in the same and surrounding years. Exhibit 14, Relocation Expense Report Excerpt.

**Healthcare Reviews:** Counts 50-52 charge the Defendants with embezzling "reimbursements for medical care" from the IBB's healthcare plan, and Count 49 charges the Defendants with a conspiracy to commit healthcare fraud related thereto. (Doc. 1 at 45-49.)

Legacy noted in its annotations to the IBB's financial reviews that, after a third-party administrator handled healthcare claims, Kathy Stapp "perform[ed] a review and then approve[d] the payments." Exhibit 15, Healthcare Audit Report Excerpt.

**Fraud inquiries:** These are interviews of some executives and some mid-and-lower-tier employees designed to root out fraud concealed by executives. Kathy Stapp was interviewed. Topics included "business purpose (or lack thereof)," authorizations for expenditures, and related-party transactions. She reported no evidence of fraud to Legacy. *See* Exhibit 16, Fraud Risk Inquiries.

**Financial reporting:** Legacy confirmed its understanding of the IBB's "key controls" for financial reporting, which included ensuring IEC authorization and adequate review of investments (including the loans to the BOL) "by conversations with . . . Kathy Stapp." Exhibit 17, Financial Reporting System Documentation, at 2, 13, 24.

These communications and related notes are specifically described, relevant, admissible, necessary for Defendants to put on a full defense, unavailable by any other means more reasonable than a subpoena to the IBB itself, likely to delay the trial or result in a mistrial if produced in the middle of it, and tailored in good faith to the issues in the Indictment.

C.    **Kathy Stapp's Communications Regarding the Whistleblower Letter and Article 17 Charge**

The proposed Subpoena also seeks the following documents exchanged between Kathy Stapp and Simmons or Fultz:

- IBB records provided by Kathy Stapp to Tim Simmons after the February 26, 2023 IEC meeting in Marco Island, as referred to in Mr. Simmons' grand jury testimony (and see Grand Jury Exhibit 7), and that served the basis of Mr. Simmons' whistleblower letter and Article 17 charge.

- Emails between Kathy Stapp and Tim Simmons or John Fultz regarding Kathy Stapp's handwritten letter to Mr. Simmons and Mr. Fultz in approximately the spring/summer 2023.

As noted above, following the Marco Island meeting, Simmons met with Ms. Stapp about Marco Island and Ms. Stapp provided a "lot of documentation" to Simmons so that Simmons could prepare a purported whistleblower letter ("Whistleblower Letter") against Newton Jones, dated March 25, 2023. *See* Exhibit 18, Whistleblower Letter. The Whistleblower Letter was submitted anonymously and made various accusations against Newton Jones, including backpay to Kate Jones, salaries of Jones' family members, international and local travel and meal expenses, travel to Ukraine, funds used to revamp the IBB's headquarters, and alleged attendance issues. *Id.*

On April 14, 2023, Fultz filed a formal Article 17 charges under the IBB Constitution against President Jones ("Article 17 Charge"), which was a condensed version of the Whistleblower Letter, including only three issues: (1) back payments to Kate Jones; (2) travel to Ukraine; and (3) meal charges in North Carolina. *See* Exhibit 19, Article 17 Charge.

This context indicates Ms. Stapp played a central role in the Whistleblower Letter and Article 17 Charge, both of which address the same issues charged in the Indictment. Moreover, how and why Ms. Stapp, Simmons, and Fultz determined which allegations warranted inclusion in the official Article 17 Charge is relevant in that many of the original "issues" in the Whistleblower Letter were, upon further review, plainly authorized and proper under the IBB's Constitution and were the topic of legal advice in several formats, not least of which was the September 2022 Blake & Uhlig memo.[9] Union officers' communications regarding these issues

---

[9] Defendants do not concede that the issues which made it into the final Article 17 Charge were valid and/or carry any legitimacy. But that does not mean that Ms. Stapp, Simmons, and Fultz' decision to drop other items does not cast an extra layer of doubt on those issues.

and related interpretations are relevant here not only to impeachment of these witnesses but also to the Defendants' state of mind.

The documents are also identified with the requisite specificity. Both Ms. Stapp and Simmons have admitted that Ms. Stapp provided the documents that served as the basis for the Whistleblower Letter and Article 17 Charge shortly after the February 26, 2023 IEC meeting in Marco Island. Those documents, and the related communications, are identified with specificity, limited in time, and sharply defined.

Finally, there are no admissibility issues with these documents. These communications are not with attorneys or otherwise privileged, and Stapp, Fultz, and Simmons are all expected to testify at trial. Thus, Defendants have made a sufficient preliminary showing of admissibility for these requests. *See Nixon*, 418 U.S. at 700.

### D.    Kathy Stapp's Authorization

The proposed Subpoena also seeks the following documents and communications relating to Ms. Stapp's authorization of various charged offenses, including:

- Kathy Stapp's "email to herself" and the "numerous messages/texts/calls" regarding Newt Jones' bill from the IBB Conference in February 2023 at Marco Island, Florida, as specified by Kathy Stapp in her proffer to the government on August 18, 2023.

- Emails between Kathy Stapp and Jim O'Leary regarding the foreign assignment letter[10] dated March 18, 2022 designating Jim O'Leary for travel to Paestum, Italy.

- Emails between Kathy Stapp and Michael Snowden regarding the foreign assignment letter dated April 10, 2019 designating Michael Snowden for travel to Italy.

- Emails between Kathy Stapp and Sara Baez or Carolyn Nitcher regarding Newt Jones' out-of-pocket expenses for 2018, as reflected

---

[10] Foreign assignment letters were official IBB letters designating certain IBB officers and employee for international travel.

in a June 3, 2019 email from Sara Baez to Carolyn Nitcher, in the weeks leading up to June 3, 2019.

- Emails from June 1, 2023 through July 31, 2023 between Kathy Stapp and Debbie Goodwin regarding Defendants' vacation payouts in July 2023.

These documents are relevant. As more fully detailed in Ms. Stapp's Plea Agreement (Doc. 79), Ms. Stapp was central to, and specifically authorized, many of Defendants' actions the Government has charged as improper. Most notably, Ms. Stapp reviewed and authorized the backpay of Kate Jones, reviewed and authorized Defendants' vacation payouts, and reviewed and authorized the many salaries at issue. Ms. Stapp also approved the international travel expenses, as well as the meal and other expense charges in North Carolina. Such authorization–which was made without question, let alone comment from Ms. Stapp–goes directly to the Defendants' state of mind and Ms. Stapp's credibility.

The requests are also identified by date and topic, and are limited to specific items Ms. Stapp has admitted to authorizing and/or handling on behalf of the IBB. Defendants have therefore sufficiently identified "the item sought and what the item contains" for each. *See* Doc. 202 at 4-5 (citing *Romero*, No. 21-cr-00559-JCH, 2023 WL 2614472, at *3.

Finally, Ms. Stapp is expected to testify and there are no other evidentiary issues with the requested documents or communications.

## II.    Tim Simmons Communications, Notes, and Memoranda

Simmons was previously the administrative assistant to the International President (Newton Jones), an International Vice President, and is now the current International President of the IBB. Simmons, in coordination with Ms. Stapp, was the driving force behind the Whistleblower Letter and Article 17 Charge against Newton Jones, both of which contained

17

allegations identical to those now charged in the Indictment, including issues regarding compliance with the IBB's policies and procedures.

As discussed above, the Blake & Uhlig Memo was addressed to Ms. Stapp and Simmons and followed a meeting between Ms. Stapp, Simmons, and Blake & Uhlig on or about September 13, 2022. Simmons was directly involved in that process, including the procurement of legal advice. Months after the Blake & Uhlig Memo and immediately following the 2023 annual IEC meeting in Marco Island in February of 2023, Simmons discussed various concerns regarding Newton Jones and his expenditures with Ms. Stapp. Simmons also began preparing the Whistleblower Letter , *see* Ex. 18, which was then incorporated in, and served the basis of, the Article 17 Charge.

Simmons was the ultimate benefactor of the events that, in early to mid 2023, led to Newton Jones' expulsion and Simmons' eventual appointment as International President himself. Simmons' is expected to testify at trial, and the documents requested relating to Simmons go directly to Simmons' credibility.

### A.     Tim Simmons's Communications with Counsel

The proposed Subpoena demands the following communications between Simmons and the IBB's counsel and his related notes and memoranda:

- Emails from May 1, 2022 through September 20, 2022 between Tim Simmons and Kathy Stapp regarding the IBB's expense policies that were the subject of a meeting between Kathy Stapp, Tim Simmons, and Blake and Uhlig attorneys in the early fall (August 1, 2022 – September 19, 2022), and later reflected in a memorandum dated September 20, 2022 drafted by Blake and Uhlig and addressed to Tim Simmons and Kathy Stapp.

- Emails from May 1, 2022 through September 20, 2022 between Tim Simmons and any representative of Blake and Uhlig regarding the meeting between Kathy Stapp, Tim Simmons, and Blake and Uhlig attorneys in the fall of 2022.

- Emails from May 1, 2022 through July 25, 2023 (date of Newt Jones' retirement) between Tim Simmons and any representative of Blake and Uhlig regarding the memorandum dated September 20, 2022 addressed to Tim Simmons.

- Emails from April 1, 2022 through December 12, 2023 between Tim Simmons and David Elbaor regarding Mr. Elbaor's investigation into the IBB's policies and procedures, including for reimbursements and expenses.

These documents are relevant, admissible, and specifically sought for largely the same reasons identified for Kathy Stapp's related counsel communications. *See* supra Section I(a). These communications are similarly limited to *specific* timeframes and relate to topics that other materials indicate Simmons communicated with counsel about, as opposed to generally requesting the entire email account. Defendants have therefore satisfied the specificity requirements by detailing "the item sought and what the item contains." *See* Doc. 202 at 4-5 (citing *Romero*, No. 21-cr-00559-JCH, 2023 WL 2614472, at *3).

As for relevancy, Simmons was also involved in the September 2022 meeting with Blake & Uhlig that ultimately led to the Blake & Uhlig Memo, which was addressed in part to Simmons. Simmons' communications with the IBB's counsel, and what both Simmons and counsel stated regarding the exact topics charged here (e.g., expense reporting), are clearly relevant to Defendants' knowledge and intent when Defendants, who were also employees of the IBB at the time, are receiving and reasonably relying on that same advice. Moreover, Simmons' communications with Elbaor on those same topics, when Elbaor was also giving the same advice to Defendants, are similarly relevant to Defendants' knowledge and intent.

As for admissibility, the documents requested here fall within the IBB's waiver over communications relating to "expense reporting and reimbursement issues discussed on September 13, 2022[,]" and the "salary, benefits, and other expenses that a union is permitted to pay its officers and employees." (Doc. 177 at 12). And, as for Elbaor communications, as more fully set forth

above, the IBB similarly waived privilege by filing the IBB's Counterclaim, which details Elbaor's investigation of (and communications relating to) the IBB's policies and procedures. These communications therefore fall within the scope of waiver, are not privileged, and are admissible.

### B.    Tim Simmons's Communications Regarding the Whistleblower Letter and Article 17 Charge

The proposed Subpoena also seeks the following documents and communications relating to the Whistleblower Letter and Article 17 Charge:

- Emails from February 26, 2023 through April 17, 2023 between Tim Simmons and Kathy Stapp or Tom Baca regarding the whistleblower letter Simmons drafted and submitted on March 25, 2023.

- Drafts, handwritten notes, and electronically stored information regarding the March 24, 2023 whistleblower letter.

- Emails from February 26, 2023 through April 17, 2023 between Tim Simmons and Kathy Stapp regarding the February 26, 2023 IEC meeting in Marco Island, Florida, and handwritten notes from in person discussions.

- Emails from February 26, 2023 through April 17, 2023 between Tim Simmons and Kathy Stapp regarding Newton Jones' travel to and from the Ukraine.

- IBB records provided to Tim Simmons by Kathy Stapp following the February 26, 2023 IEC meeting in Marco Island, Florida, as referred to in Mr. Simmons' grand jury testimony, which served the basis of Mr. Simmons' whistleblower letter and Article 17 charge.

- Drafts, handwritten notes, and electronically stored information regarding the April 17, 2023 Article 17 charge.

- A handwritten letter from Kathy Stapp to Timothy Simmons regarding an internal investigation, in approximately April 2023.

These requests are relevant, admissible, and specifically sought. Each request identifies by date and topic the specific documents and communications and are limited to the key timeframes of these communications.

As for relevance, as the author of the Whistleblower Letter and Article 17 Charge, Simmons possessed documents and communications about the same conduct charged in the Indictment. Those documents and communications, including the decision(s) to draft and file the same, are relevant to the defense.

Moreover, despite approving of and engaging in the same policies and practices as Defendants, and receiving similar reimbursements, salaries, and benefits as Defendants, Simmons was not indicted. Defendants believe Simmons emails will demonstrate the timing of Simmons' objections to certain IBB practices, in coordination with Ms. Stapp, Baca, and Fultz. These documents go directly to Simmons' credibility.

Finally, the documents are admissible. Simmons is expected to testify, the communications aren't privileged, and there are no other glaring admissibility issues. Thus, Defendants have made a sufficient preliminary showing of admissibility for these requests. *See Nixon*, 418 U.S. at 700.

### III.    John Fultz Communications

The Subpoena seeks the following documents regarding Fultz:

- Emails from February 1, 2023 through April 30, 2023 between John Fultz and Tim Simmons/Kathy Stapp/Tom Baca/or Arnie Stadnick regarding the Article 17 charge Mr. Fultz lodged against Newton Jones on April 17, 2023.

- Emails from February 26, 2023 through April 30, 2023 between John Fultz and Tim Simmons/Kathy Stapp/Tom Baca/or Arnie Stadnick regarding the February 26, 2023 IEC meeting in Marco Island, Florida,.

- Copies of the handwritten letter that Kathy Stapp mailed to John Fultz and Tim Simmons in approximately April, 2023 (might also exist in Simmons or Stapp's account).

- Emails from April 1, 2022 through December 12, 2023 between John Fultz and David Elbaor regarding Mr. Elbaor's investigation

into the IBB's policies and procedures, including for reimbursements and expenses.[11]

- Kathy Stapp's communications to John Fultz following the Marco Island Conference in which she claimed "whistleblower protection," as specified by Kathy Stapp in her proffer to the government on August 18, 2023.

These requests are specific. The requests each describe the item sought with specific dates and date ranges, and have therefore sufficiently described "the item sought and what the item contains." *See* Doc. 202 at 4-5 (citing *Romero*, No. 21-cr-00559-JCH, 2023 WL 2614472, at *3).

As for relevance, similar to Simmons, Fultz was an IVP who enjoyed and engaged in the same policies and practices as Defendants, and received similar reimbursements, salaries, and benefits as Defendants, but was not indicted. After the February 2023 Marco Island IEC meeting, Fultz was in constant communication with Ms. Stapp, Simmons, Baca, and Arnie Stadnick[12] regarding the Whistleblower Letter and Article 17 Charges. These actions were in stark contrast with Fultz' prior participation in much of the charged conduct, and go directly to Fultz' credibility. Thus, these requests have at least a rational inference of relevancy under Nixon. *See Nixon*, 418 U.S. at 700 (requiring "rational inference" of relevancy).

As for admissibility, Fultz is expected to testify, the communications aren't privileged, and there are no other glaring admissibility issues. Thus, Defendants have made a sufficient preliminary showing of admissibility for these requests. *See Nixon*, 418 U.S. at 700.

## IV.     Tom Baca's Communications

---

[11] Defendants' request for Fultz communications with Elbaor are specific, relevant, and admissible for the same reasons as the identical request for communications between Elbaor and Simmons. *See infra* Section II(a).

[12] Fultz testified in grand jury proceedings that there was a split in the IEC counsel after the February 2023 Marco Island IEC meeting, and his side of the split included himself, Simmons, Fultz, and Stadnick.

### A.    Tom Baca's Communications with Counsel

The Subpoena seeks the following documents regarding Baca's communications with counsel:

- Emails from April 1, 2022 through December 12, 2023 between Tom Baca and David Elbaor regarding Mr. Elbaor's investigation into the IBB's policies and procedures, including for reimbursements and expenses.

This is a specific request for relevant, admissible documents for all the same reasons discussed above as to Kathy Stapp's communications with Mr. Elbaor. In short, the privilege has been waived for the reasons discussed above; the requests describe the items sought with a specific date range; and what they contain are highly relevant communications that will be admissible to show Defendants' state of mind and reliance on advice of counsel.

### B.    Tom Baca's Communications Regarding the Hiring of His Son

The Subpoena also seeks the following documents regarding the hiring of Mr. Baca's son:

- Emails between Tom Baca and Kathy Stapp regarding the hiring, salary, and benefits for John Baca, from three months preceding the date John Baca was hired.

This request is specific, relevant, and admissible. It identifies what the documents are (emails), what they contain (personnel information), with an appropriate date range (three months prior to hiring). These emails are relevant to the Defendants' state of mind. Specifically, the Government alleges Defendants Newton Jones and William Creeden improperly hired family members. (Doc. 1 at p. 21-23 ¶¶ 30-35.) As discussed above, the Government must prove beyond a reasonable doubt that they did this without authorization, with fraudulent intent, and in bad faith. *Ottley*, 509 F.2d at 671; *Hart*, 417 F. Supp. at 1317. Coupled with the fact that unions historically have encouraged their members' families to join and participate in leadership, the fact that this

tradition continued with other *current* members of the IEC is highly probative and admissible to show authorization and good faith.

### C.    Tom Baca's Communications Regarding International Travel

The Subpoena demands the following documents regarding Baca's own international travel:

- Emails between Tom Baca and Newt Jones or Kathy Stapp regarding a June 6, 2014 international business trip to Madrid, Spain that Mr. Baca attended.

- Emails between Tom Baca and Kathy Stapp regarding a January 31, 2020-February 10, 2020 trip to London, England that Mr. Baca attended.

- Emails between Tom Baca/Kathy Stapp/John Baca regarding a November 27, 2015 trip to Paris, France that John Baca (Mr. Baca's son) attended.

- Emails and documents regarding Mr. Baca's trip to Germany to visit with Siemens in or around March 2024.

These requests are specific, relevant, and admissible. They are specific because they identify the documents sought within a specified date range and describe what they contain. They are relevant to the Government's central allegation: that the international travel was "unauthorized," "not necessary," and not "for [the IBB's] benefit." Mr. Baca's communications surrounding his overseas trips are likely to be admissible to show both *why* he was traveling and how it was intended to benefit the IBB. *See* Doc. 221-3 at 25 (noting that the Siemens global framework agreement helped IBB members organize drives in the United States). These communications will also be admissible to demonstrate Mr. Baca's opportunity to lodge objections, the lack thereof, and what was reasonably understood among IEC members about the necessity and purpose of the international travel.

WHEREFORE, for the aforementioned reasons, Defendants respectfully ask that the Court issue the requested Subpoena attached hereto as Exhibit 1, and for such other relief as the Court deems just and proper.

Respectfully submitted,

SPENCER FANE LLP

/s/ *Daniel Nelson*
Patrick A. McInerney # 22561
Daniel M. Nelson KS Fed # 79203
SPENCER FANE LLP
1000 Walnut Street, Suite 1400
Kansas City, Missouri 64106-2140
Tele: 816-474-8100
Fax: 816-474-3216
pmcinerney@spencerfane.com
dnelson@spencerfane.com
Attorneys for Newton Jones

/s/ *Kurt Kerns*
Kurt P. Kerns # 15028
KERNS LAW GROUP
328 N. Main Street Wichita, KS 67202
Tele: 316-265-5511
kurtpkerns@aol.com

Federico Andino Reynal, *pro hac vice*
THE REYNAL LAW FIRM, PC
917 Franklin Street, Sixth Floor
Houston, TX 77002
Tele: 713-228-5900
areynal@frlaw.us
Attorneys for William Creeden

/s/ *Mark Molner*
Mark D. Molner # 24493
EVANS & MULLINIX, P.A.
7225 Renner Road, Suite 200
Shawnee, KS 66217
Tele: 913-962-8700
Fax: 913-962-8701
mmolner@emlawkc.com

John T. Davis, *pro hac vice*
KESSLERWILLIAMS LLC
1401 S. Brentwood Blvd., Suite 950
St. Louis, MO 63144
Tele: 314-455-5555
Fax: 314-727-2869
john.davis@kesslerwilliams.com
Attorneys for Kateryna Jones

/s/ *J.R. Hobbs*
James R. Hobbs KS Fed # 70169
Marilyn Keller # 15444
WYRSCH HOBBS & MIRAKIAN, P.C.
One Kansas City Place
1200 Main St., Suite 2110
Kansas City, Missouri 64105
Tele: 816-221-0080
Fax: 816-221-3280
jrhobbs@whmlaw.net
mbkeller@whmlaw.net
Attorneys for Warren Fairley

/s/ *Branden Smith*
Branden Smith # 22761
SMITH LEGAL, L.L.C.
719 Massachusetts Street, Suite 126
P.O. Box 1034
Lawrence, Kansas 66044
Tele:  785-856-0780
Fax:  785-856-0782 branden@smithlegalllc.com

Kevin M. Spellacy, *pro hac vice*
James Wooley, *pro hac vice*
Erin E. Hanson, *pro hac vice*
323 W. Lakeside Ave., Suite 200
Cleveland, OH 44113
Tele: 216-344-9220
Fax: 216-664-6999
kspellacy@spellacylaw.com
jwooley@spellacylaw.com
ehanson@mghslaw.com
Attorneys for Lawrence McManamon

/s/ *Kathleen Fisher Enyeart*
Jackson Hobbs # 28191
Kathleen Fisher Enyeart # 25203
Brody Sabor KS Fed # 79098
LATHROP GPM
2345 Grand Blvd., Suite 2200
Kansas City, Missouri 64108
Tele: 816-292-2000
Fax: 816-292-2001
jackson.hobbs@lathropgpm.com
kathleen.fisherenyeart@lathropgpm.com
brody.sabor@lathropgpm.com
Attorneys for Cullen Jones

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was electronically filed on February 6, 2026, with the Clerk of the Court for delivery to interested parties.

/s/ *Daniel Nelson*
Attorney for Newton Jones